**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANGELA LYNNE MARTIN, Individually and as Administratrix of the ESTATE OF HOWARD EDWARD MARTIN, JR., | : | No. 4:15-CV-02034 |
| | : | |
| | : | (Judge Brann) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| NORFOLK SOUTHERN RAILWAY COMPANY, TODD MICHAEL BUBNIS, JAMES ERNEST MOFFETT, and CLINTON TOWNSHIP, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

**MARCH 24, 2021**

## I.    BACKGROUND

Pending before this Court is a motion for summary judgment filed by

Norfolk Southern, Todd Michael Bubnis, and James Ernest Moffett (collectively,

"Defendants").[1]  This case arises from a train-automobile collision at a railroad

crossing in Clinton Township, Lycoming County, Pennsylvania.[2]  Plaintiff Angela

Lynne Martin, the spouse of the automobile driver, Howard Edward Martin, Jr.,

---

[1]    Doc. 101.  In November 2019, Plaintiff settled her claims against the only other defendant, Clinton Township.  Doc. 122.

[2]    Doc. 41.

now deceased, asserts two negligence claims against Norfolk Southern, Bubnis, and Moffett.

This motion is now ripe for disposition; for the foregoing reasons, Defendants' motion is granted in part, and denied in part.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 prescribes the procedures for granting summary judgment.  Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3]  Thus, to rule on a motion for summary judgment, a court must determine whether the parties have raised a *factual* dispute, whether that dispute is *material* to the conclusion of the case, and whether the dispute is *genuine*.[4]  If the court finds no factual dispute, or concludes that it is immaterial or not genuine, it will then evaluate whether the moving party is entitled to judgment as a matter of law.[5]

Facts are material where they could alter the outcome of the case, and disputes are genuine if evidence exists from which a rational person could conclude that the party bearing the burden of proving this fact is correct.[6]  For

---

[3]   Fed. R. Civ. P. 56(a).
[4]   *See id.*
[5]   *Id.*
[6]   *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (first citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); and then citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

movants and non-movants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (1) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (2) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (3) "showing . . . that an adverse party cannot produce admissible evidence to support the fact."[7]

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[8]  "Regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[9]

If the movant does not bear the burden of proof at trial, they may succeed if they can point out "an absence of evidence that rationally supports the plaintiff's case."[10]  In such cases, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury

---

[7]   Fed. R. Civ. P. 56(c)(1).
[8]   *Celotex*, 477 U.S. at 323 (internal quotations omitted).
[9]   *Id.*
[10]   *Clark*, 9 F.3d at 326.

could return a verdict for the plaintiff on the evidence presented."[11] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[12]

Once the movant has sufficiently stated grounds for summary judgment, the burden then shifts to the nonmovant to set forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[13] "When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"[14] "[I]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."[15] On a motion for summary judgment, "the court need consider only the cited materials, but it may consider other materials in the record."[16]

---

[11]  *Liberty Lobby*, 477 U.S. at 252.
[12]  *Id.*; *see also Celotex*, 477 U.S. at 323-24 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose.").
[13]  *Liberty Lobby*, 477 U.S. at 250.
[14]  *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.).
[15]  Fed. R. Civ. P. 56(e)(2).
[16]  Fed. R. Civ. P. 56(c)(3).

Finally, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[17]  "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[18]  "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted."[19]

## III.    UNDISPUTED FACTS

### A.    The Brick Church Road Crossing

As stated above, the accident at issue took place at the Brick Church Road crossing in Clinton Township, Lycoming County, Pennsylvania.[20]  At the crossing, Brick Church Road consists of two-lanes (one lane in each direction) intersecting an east-west railroad track called the "Buffalo Line."[21]  Brick Church Road is paved and runs north-south at a perpendicular angle to the Buffalo Line tracks.[22]

There is an approximately 430 foot stretch between the Brick Church Road crossing and the closest highway, Route 405.[23]  This stretch is "relatively flat."[24]  However, when traveling southbound on the road towards the crossing, one can see

---

[17]  *Liberty Lobby*, 477 U.S. at 249.
[18]  *Id*.
[19]  *Id*. at 249–50 (internal citations omitted).
[20]  Doc. 102.
[21]  *Id.* at ¶ 15; Doc. 111-4 at 1.
[22]  Doc. 102 at ¶¶ 15-16.
[23]  *Id.* at ¶ 19.
[24]  *Id.* at ¶ 18; Doc. 102-6.

a church and other building on the left, and a cemetery on the right.[25]  This section of the road has a speed limit of 35mph.[26]

The Brick Church Road crossing has two reflectorized crossbucks placed on either side of the crossing; one faces those driving northbound, the other faces those driving southbound.[27]  It does not have flagmen, gates, or warning lights.[28] Nor are there warnings painted on the pavement advising drivers that they are approaching a railroad crossing.[29]

Norfolk Southern, a Virginia railway company, owns, operates, and maintains the Buffalo Line tracks and its right of way.[30]  At the time of the accident, Norfolk Southern had contracted with East Coast Right of Way ("East Coast") to control vegetation running along the track.[31]  Norfolk Southern's right of way extends fifteen feet from the center of the track in each direction.[32] Accordingly, East Coast only controlled vegetation within this fifteen-foot right of way.[33]  As a matter of policy, East Coast did not control vegetation on private property not belonging to Norfolk Southern.[34]

---

[25]  Doc. 102 at ¶ 18; Doc. 102-6.
[26]  Doc. 102-6.
[27]  *Id.*
[28]  *Id.*
[29]  *Id.*
[30]  Doc. 102 at ¶ 7.
[31]  Doc. 102-9 at 12:21-13:1.
[32]  *Id.* at 55-56.
[33]  *Id.*
[34]  *Id.* at 54:2-56:20.

Norfolk Southern runs two trains a day through the Brick Church Road

crossing.[35]  At the crossing, the federally mandated speed limit was sixty miles per

hour for freight trains.[36]  Pursuant to internal policy, Norfolk Southern operates

trains at this location at a reduced speed, imposing a lower speed limit of fifty

miles per hour.[37]

### B.   Norfolk Southern's Internal Procedures

### 1.   Corporate Policies

In 1993, Norfolk Southern issued internal Corporate Policy 613.[38]

Acknowledging that "state governments have the primary responsibility for

highway railroad crossing safety, including the location or closure of crossings and

the design and installation of crossing warning systems," the policy stated that "it

is in the public interest and [Norfolk Southern's] to participate actively in

identifying hazardous conditions, making such conditions known to government

officials and implementing appropriate corrective measures."[39]

Further, Policy 613 states that Norfolk Southern "will develop and pursue

with the states its own agenda of grade crossing closure and improvement."[40]  To

this end, the policy declares that "[i]n appropriate situations, corporate funds will

---

[35]  Doc. 111-5 at 57:5-7.
[36]  Doc. 102-3; Doc. 102 at ¶ 11 (citing 49 C.F.R. § 213.9).
[37]  Doc. 102-4 at 23:18-24:3.
[38]  Doc. 113-5 at 1-2.
[39]  Doc. 113-5 at 2.
[40]  *Id.*

be expended in order to facilitate crossing closure or to guarantee completion of a project which would otherwise fail to be implemented for lack of local matching funds."[41]

The policy puts the burden of determining whether a railroad crossing is unsafe in part on "Operations Division Safety Teams and individual personnel."[42] Specifically, the policy makes these groups "responsible for identifying conditions which could interfere with the ability of a motorist to appreciate the potential hazard of an approaching train."[43]  When applicable, "[c]onstruction of safety improvements is to be expedited, consistent with sound engineering procedures and efficient use of corporate assets."[44]

In 2000, Policy 613 was rescinded and reissued as Policy 400.[45]  Policy 400 largely just reiterated the language and principles set forth in Policy 613.[46]  Policy 400 was again reissued in 2007 with little change.[47]

### 2.    Division Grade Crossing Committees

Norfolk Southern uses Division Grade Crossing Committees ("Committees") to identify and remedy hazardous conditions at railroad

---

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.* at 6-7; Doc. 115-3 at 21:15-17 ("When a policy is reissued—when a policy is issued, it supersedes the previous document.").

[46] Doc. 113-5 at 6-7.

[47] *Id.* at 8-9.

crossings.[48]  At some point in time, Norfolk Southern issued guidelines for the Committees to follow.[49]  Under the guidelines, the committees were "charged with identifying and alleviating conditions at any grade crossing which could interfere with the ability of the motorist to appreciate the potential hazard of an approaching train."[50]  "Examples [of this] would include view obstructions such as embankments, weeds, trees, buildings and railroad facilities such as battery boxes and relay cases."[51]  These committees were to discuss "remedies for hazardous conditions" at each meeting, and delegate responsibility to district personnel to achieve specific remedies.[52]  The policy clarified that "[c]losure of grade crossings should be emphasized."[53]

Norfolk Sothern provided further guidance regarding the Committees' responsibilities in its internal Corporate Policies 400.1 and 400.2.[54]  Both policies were intended to implement Policy 400 by providing "guidelines for the identification of opportunities for grade crossing improvements."[55]  They were first

---

[48]  Doc. 113-5 at 5-6.

[49]  *Id.*; Doc. 111-5 at 22:23-25 (referring to these as "suggestions and guidelines to help be involved in the grade crossing safety process").  Though Martin cites to these guidelines, she has not identified the date which they were released or issued or if these guidelines were in effect at the time of the collision.  For purposes of this motion, the Court will consider these guidelines to have been active on the date of the accident.

[50]  Doc. 113-5 at 5.

[51]  *Id.*

[52]  *Id.* at 6.

[53]  *Id.*

[54]  *Id.* at 11-30.

[55]  *Id.* at 11, 20.  The wording of this is slightly different in Policy 401.1, however, the Court finds any distinction to be negligible, at least for purposes of deciding this motion.  *Id.* at 11 ("[Policy

issued in 1998, but were rescinded and reissued between 2000-2002.[56]  Both were

again reissued in 2008.[57]  The Court will only refer to the most recent versions

because those would be the relevant policies in effect at the time of the collision.

Policy 400.1 lists several committee-member responsibilities, one of which

includes to "[i]dentify and assist in opportunities to improve grade crossing safety

and reduce trespassing."[58]  Policy 400.2 states that "[t]he determination of need

and selection of devices at a highway/railway grade crossing is made by the public

agency with jurisdictional authority who will identify and arrange for installation

of appropriate traffic control devices."[59]  Notably excised from the 2008 version of

Policy 400.2 is any requirement that the Committees inspect hi-rail segments for

hazards at least six times a year.[60]  However, the policy does provide that the

"Public Improvements Group will assist the Administrator Highway Grade

Crossings, and Grade Crossing Safety Group as needed."[61]

## C.    The Accident

On August 15, 2014, Howard Martin's car collided with a Norfolk Southern

train.[62]  In the car with him and riding as a passenger was Darrin Ziemer, a

---

401.1] implements Corporate Policy 400 and provides guidelines for division grade crossing
and trespasser safety efforts.").

[56]  *Id.* at 11-30.

[57]  *Id.*

[58]  *Id.* at 13.

[59]  *Id.* at 28.

[60]  *Id.* (noting the omission in the 2008 policy).

[61]  *Id.* at 29.  It is unclear from the record what the Public Improvements, Administrator Highway
Grade Crossings, and the Grade Crossing Safety Group or their functions are.

[62]  Doc. 102-2.

coworker at the construction company where they both worked.[63]  They were

returning to work from lunch around 12:26 p.m.[64]  Mr. Martin was driving

southbound on Brick Church Road towards the crossing at approximately twenty-

eight miles per hour.[65]  At some point, Mr. Martin began to brake; at the time of

collision, his car was traveling at eleven miles per hour.[66]  His car was struck on

the front drivers' side by the westbound train.[67]  Both Mr. Martin and Ziemer were

killed.[68]

The train that struck Mr. Martin's car was operated by engineer Todd Bubnis

and conductor James Moffett.[69]  In compliance with federal regulations, the crew

blew the train's horn at least fifteen, but not more than twenty-five, seconds prior

to the collision.[70]  Though it is undisputed that the train's headlight and ditch lights

were turned on and the train's horn was blown at the time of the accident, the

parties dispute whether the train's horn was audible and whether the lights were

visible to Mr. Martin.[71]

---

[63]  *Id.*
[64]  *Id.*
[65]  Doc. 102-18 at 4-5; Doc. 102-19; Doc. 102-20 at 9.
[66]  Doc. 102-19.
[67]  Doc. 102-2.  The train consisted of three engines and 105 coal cars, and weighed approximately
14,465 tons.  *Id.*
[68]  *Id.*
[69]  *Id.*
[70]  49 C.F.R. § 222.21; Doc. 102-15; Doc. 102-17 at 22-23.
[71]   Doc. 102-16 at 34-36; Doc. 102-18 at 5; Doc. 112 at ¶¶ 38-40.

## IV.   DISCUSSION

Martin pursues two theories of negligence: (1) that Norfolk Southern failed to provide adequate signage at the Brick Church Road crossing; and (2) that Norfolk Southern failed to comply with a self-imposed duty of care established by its own internal corporate policies.  Under both theories, Martin contends that Norfolk Southern breached its duties of care by failing to inspect the Brick Church Road crossing for hazardous conditions and failing to advocate for better signage or the crossing's closure.

Defendants seek to dismiss Martin's claims on three grounds.  First, they assert that Martin's inadequate signage claim is preempted, and alternatively, that Norfolk Southern met its common-law duty of care.  Second, Defendants maintain that Norfolk Southern's corporate policies did not create a legal duty.  Third, Defendants argue that Mr. Martin was more than fifty percent at-fault for his injuries; they thus ask the Court to find Mr. Martin comparatively negligent as a matter of law and to dismiss both of Martin's claims.

The Court's conclusions are as follows.  First, Defendants' motion is denied as to Martin's inadequate signage claim because it is not preempted and because a genuine dispute of material fact exists regarding whether Norfolk Southern breached its common-law duty of care.  Second, Defendants' motion is granted as to Martin's self-imposed duty claim because Martin has not shown that Defendants assumed a legal duty to comply with Norfolk Southern's internal corporate

policies.  Third, Defendants' motion is denied as to Defendants' comparative

negligence defense because genuine disputes of material facts exist regarding Mr.

Martin's alleged negligence.

### A.      Inadequate Signage Claim

#### 1.      Federal Preemption

Defendants first argue that Martin's inadequate signage claim is preempted.

The Federal Railroad Safety Act was enacted in 1970 to "promote safety in every

area of railroad operations and reduce railroad-related accidents and incidents."[72]

"To aid in the achievement of these goals, the Act specifically directs the Secretary

of Transportation to study and develop solutions to safety problems posed by grade

crossings."[73]  The Secretary's power under the Act is broad; it includes authority to

"prescribe, as necessary, appropriate rules, regulations, orders, and standards for all

areas of railroad safety."[74]

The Act also contains an express preemption clause, which is triggered

whenever a federal regulation "substantially subsume[s] the subject matter of the

relevant state law."[75]  Preemption applies to state laws, rules, regulations, orders,

---

[72]  49 U.S.C. § 20101.

[73]  *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 661-62 (1993) (internal citations omitted).

[74]  *Id.* at 662 (internal quotation marks omitted) (quoting 45 U.S.C. § 431(a)).

[75]  *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 356 (2000) (quoting *Easterwood*, 507 U.S. at 664) (alterations in original).

and standards pertaining to railroad safety.[76]  Falling within these broad categories

are state- and common-law claims.[77]

The Federal Railroad Safety Act generally preempts state-law claims based

on a railroad company's failure to provide adequate signage at a crossing.[78]  For

preemption to attach, however, a defendant must show that a particular crossing's

warning device has been "installed using federal funds."[79]  Preemption applies

even where an installed warning device was only partially paid for with federal

funds.[80]  Nevertheless, because preemption is an affirmative defense, its proponent

bears the burden of proving that federal funds were in fact used to install a specific

warning device.[81]

Defendants concede that "there is no direct evidence" that the reflectorized

crossbucks at the Brick Church Road crossing were installed using federal funds,

and acknowledge that this seriously undermines their preemption defense.[82]

---

[76]  *Easterwood*, 507 U.S. at 664 (quoting 45 U.S.C. § 434).

[77]  *Id.* ("Legal duties imposed on railroads by the common law fall within the scope of [the preemption clause's] broad phrases."); *see also* 49 U.S.C. § 20106(a) ("Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable.").

[78]  *Shanklin*, 529 U.S. 357-59.  A party must also show that the Federal Highway Administration approved of the project improving the crossing at issue.  *Id.* at 357.

[79]  *Grade v. BNSF Ry. Co.*, 676 F.3d 680, 684 (8th Cir. 2012) (citing *Shanklin*, 529 U.S. at 357-59).

[80]  *See Shanklin*, 529 U.S. at 356 ("[The federal regulations on crossing signage] apply to '*any* project where Federal-aid funds participate in the installation of the devices.'" (emphasis added) (quoting 23 C.F.R. § 646.214(b)(3(i))); *see also Janero v. Norfolk S. Ry. Co.*, 2017 WL 993055, at *5 (N.D. Ind. Mar. 15, 2017) ("There is no requirement that 100% of the funds allocated to safety devices must be federal funds in order for preemption to attach (citing *Cochran v. CSX Transp., Inc.*, 112 F. Supp. 2d 733, 738 (N.D. Ind. 2000))).

[81]  *Sikkelee v. Precision Airmotive Corp.*, 907 F.3d 701, 708 (3d Cir. 2018) (citations omitted).

[82]  Doc. 118 at 1-2.

Regardless, Defendants set forth a novel theory that in their view justifies an extension of current preemption doctrine.  Specifically, they claim that federal funding should not be required to establish preemption where a crossing's warning devices were not replaced because they were deemed satisfactory by a federal review team.  Defendants contend that expanding preemption to such circumstances hews to the spirit, if not the letter, of the Federal Railroad Safety Act.  Defendants also claim that requiring proof of federal funding in this case would penalize Defendants for having proactively sought to improve the crossing's warning devices.

The Court is considerate of the predicament that Defendants find themselves in, but it cannot extend preemption doctrine in the way that they seek.  The Supreme Court has clearly established that proof of federal funding is a requisite element of establishing preemption of inadequate signage claims.[83]  And though some courts have relaxed the level of *specificity* needed to prove federal funding in certain situations,[84] the Court is not aware of any opinions ignoring the federal-funds requirement entirely.

---

[83]  *Easterwood*, 407 U.S. at 673 (finding preemption inapplicable where federal funds were earmarked for a particular crossing but was later withdrawn and transferred to other projects).

[84]  There is apparently a split of authority regarding whether preemption requires showing that federal funds can be traced to a particular warning device, or whether it is sufficient to simply demonstrate that federal funds were allocated to a state-wide warning-device-replacement program and that a particular crossing was involved in the program.  *Compare O'Bannon v. Union Pac. R.R. Co.*, 169 F.3d 1088, 1091 (8th Cir. 1999) (affirming a grant of summary judgment where the only evidence of federal funding was that federal funds were expended on a state program and the defendant railroad company had participated in that program), *and Wagoner v. CSX Transp., Inc.*, 246 F. Supp. 2d 1002, 1007 (N.D. Ind. 2003) (same), *with*

Consequently, the Court cannot identify a reasoned basis for departing from the rule that a defendant must produce evidence that federal funds were actually spent on installing a crossing's warning devices for preemption to attach.  More to the point, because Defendants concede that federal funds were not used to install or upgrade the crossbucks at Brick Church Road crossing, the Court cannot hold as a matter of law that Martin's inadequate signage theory is preempted.  Defendants' motion for summary judgment on the issue of preemption is thus denied.

### 2.    Compliance with Common Law Duty

 Defendants next seek to dismiss Martin's inadequate signage claim on grounds that they have satisfied their common-law duty to warn.  Under Pennsylvania law, railroads have a general duty to "warn motorists of approaching trains."[85]  To satisfy this duty, railroad companies must adopt "reasonably safe and effective" methods of warning travelers that a train is nearing.[86]  Whether a railroad company has exercised "ordinary care" in doing so is fact-specific, and must be determined after consideration of the dangers attendant to a particular crossing.[87]  Factors that may be taken into account include: the type of warning

---

*Malinski v. BNSF Ry. Co.*, 2017 WL 1294438, at *7 (N.D. Okla. Mar. 31, 2017) (requiring more precise tracing).

[85] *Zimmerman v. Norfolk S. Corp.*, 706 F.3d 170, 178 (3d Cir. 2013) (citing *Wilson v. Pa. R.R. Co.*, 219 A.2d 666, 668-69 (Pa. 1966)).

[86] *Nat'l Freight, Inc. v. Se. Pa. Transp. Auth.*, 698 F. Supp. 74, 78 (citing *McGlinchey v. Baker*, 365 F. Supp. 1134, 1142 (E.D. Pa. 1973)).

[87] *Id.* (citing *McGlinchey*, 365 F. Supp. at 1142).  There is no bright-line requirement that railroad companies use a particular type of warning device at a crossing.  *Cummings v. Pa. R. Co.*, 151 A. 590, 591 (Pa. 1930) ("The general rule is there is no common-law duty on the part of a railroad company to place a flagman or safety gates at a crossing."); *see also Wilson v. Pa. R.*

device (or lack thereof) used at a crossing,  the crossing's physical conditions, "the

extent of use by the public, the nature of the surroundings, and other matters

tending to show exceptional dangers incident to the particular crossing."[88]

Further, a railroad company's legal duty of care is not discharged simply

because it lacks authority to make changes to a particular crossing.[89]  For example,

even if a railroad cannot alter a crossing without government approval, a railroad

company can still be negligent for failing to file a complaint with the relevant

government authority or failing to pursue other administrative remedies.[90]  This

rule stems from Pennsylvania law holding municipal authorities responsible for

abating dangerous conditions on land not owned by the municipality.[91]  It is

---

*Co.*, 219 A.2d 666, 669 n.1 (Pa. 1966) (citations omitted).  However, just because a railroad company is not required to install particular types of warning devices does not necessarily mean that its failure to do so is reasonable.  *Buchecker v. Reading Co.*, 412 A.2d 147, 156-57 (Pa. Super. Ct. 1979) ("*Cummings* further stated that the rule that there is no common law duty to place a flagman or safety gates at a crossing 'may be departed from . . . to the extent of permitting the absence of a flagman or gates to be considered by the jury, with other facts, in determining whether or not under all the circumstances the railroad was negligent.'" (alterations in original) (citing *Cummings*, 151 A. at 591)).

[88]  *Buchecker*, 412 A.2d at 156-57.

[89]  *See Marinelli v. Montour R.R. Co.*, 420 A.2d 603, 608-09 (Pa. Super. 1980).

[90]  *Id.* ("[The railroad company] could have filed a complaint with the Township, and if that brought no relief, administrative remedies were available, which could have been initiated by filing a complaint with the public utility commission alleging the dangerousness of the crossing and requesting that the Township be ordered by the commission to maintain its road properly." (citations omitted)); *cf. Zimmerman*, 706 F.3d at 191 ("To be sure, no Pennsylvania court has expressly held that railroads have a clear duty to modify private buildings.  But cases such as *Johnson* and *Fallon* have indicated that the jury should consider privately owned buildings when deciding whether the railroad breached its duty to provide adequate sight distance." (first citing *Fallon v. Pa. Cent. Transp. Co.*, 279 A.2d 164 (Pa. 1971); and then citing *Johnson v. Pa. R.R. Co.*, 160 A.2d 694 (Pa. 1960))).

[91]  *Lengle v. N. Lebanon Twp.*, 117 A. 403, 404 (Pa. 1922) ("[I]f there is a precipitous descent to the lane adjoining, making travel along the public highway dangerous, and the only [way] to cause the owner of the lane to put it in proper shape is to barricade the highway or erect a gate at this point, in the interest of public safety, they have the power to do it, and continue it until

- 17 -

motivated by the principle that public agencies are generally required to respond to complaints alleging dangerous conditions at railroad crossings.[92]

Defendants claim that Norfolk Southern satisfied its duty as a matter of law because the reflectorized crossbucks, the audible warnings provided by the train, and the flashing head and oscillating ditch lights on the train provided sufficient warning to motorists that a train was approaching.  They also point to the fact that Norfolk Southern could not add new signage or warning devices without approval from the Pennsylvania Public Utility Commission ("PUC").[93]  Moreover, in Defendants' view, responsibility for placing advanced signage and pavement markings falls solely on PennDOT or the local highway authority, not Norfolk Southern.[94]

The Court disagrees.  The crux of Martin's claim is that Norfolk Southern's failure to petition the PUC to install more effective warning devices or to close the

---

the menace is removed."); *see also Marinelli*, 420 A.2d at 608-09 ("[W]e see no reason in principle to distinguish between the duty of municipal authorities to abate dangerous conditions on land not owned by the municipality, and the duty of a railroad to abate dangerous conditions on land not owned by the railroad, where the site in question is a public crossing.").

[92]   *Marinelli*, 420 A.2d at 609 (first citing *Borough of Plateau v. Commonwealth*, 322 A.2d 780 (Pa. Commw. 1974); then citing *Twp. of Swatara v. Commonwealth*, 312 A.2d 809 (Pa. Commw. 1973); then citing *City of Arnold v. Pa. Pub. Util. Comm'n*, 162 A.2d 77 (Pa. Super. 1960); and then citing *Scott Twp. v. Pa. Pub. Util. Comm'n*, 146 A.2d 617 (Pa. Super. 1948)).

[93]   52 Pa. Code § 33.21(c) ("Prior to installing automatic crossing signals at any unprotected crossing of a public highway, at grade, across its track or tracks, or at such a crossing, which is protected by fixed signs only, a [railroad carrier] shall submit to the [PUC] plans of such proposed installation and receive approval of such plans."); 66 Pa. C.S.A § 2702(a) (requiring all public utilities "engaged in the transportation of passengers or property" to receive the PUC's approval before constructing any facilities at a public crossing).

[94]   *See* 67 Pa. Code § 212.5(b)-(c) (discussing the entities with authority to alter signage on public thruways).

crossing constitutes negligence.  And it is clear to the Court that whether Norfolk

Southern's conduct rises to the level of negligence is a question properly decided

by a jury.  Because Norfolk Southern cannot show an absence of evidence in

support of Martin's claims, and because a genuine dispute of material fact exists

regarding Norfolk Southern's negligence, the Court finds summary judgment

inappropriate.  Defendants' motion for summary judgment on this issue is

therefore denied.

### B.      Self-Imposed Duty Claim

Defendants also seek dismissal of Martin's second claim on the basis that

Norfolk Southern's internal corporate policies do not create a legal duty of care.

Under the Good Samaritan rule, "one who undertakes, whether gratuitously or for

consideration, to render services to another [may be] held liable for negligent

rendering of those services."[95]  "Pennsylvania courts and federal courts applying

Pennsylvania law have applied the [Good Samaritan] rule in the context of

inspections allegedly conducted negligently" by government entities.[96]

"A foundational requirement of [the Good Samaritan rule] is that in order for

liability to be imposed upon the actor, he must specifically have undertaken to

---

[95]   *Blessing v. United States*, 447 F. Supp. 160, 1187 (E.D. Pa. 1978) (first citing *Pirocchi v. Liberty Mut. Ins. Co.*, 365 F. Supp. 277 (E.D. Pa., 1973); then citing *Pascarella v. Kelley*, 105 A.2d 70 (Pa. 1954); and then citing *Hamil v. Bashline*, 307 A.2d 57 (Pa. Super. 1973)).

[96]   *Id.* (first citing *Evans v. Liberty Mut. Ins. Co.*, 398 F.2d 665 (3d Cir. 1968); then citing *Mays v. Liberty Mut. Ins. Co.*, 323 F.2d 174 (3d Cir. 1963); and then citing *Evans v. Otis Elevator Co.*, 168 A.2d 573 (Pa. 1961)).

perform the task that he is charged with having performed negligently."[97]  This is

because "without the actual assumption of the undertaking, there can be no

correlative legal duty to perform that undertaking carefully."[98]  Consequently, to

establish a legal duty under the Good Samaritan rule, a party must demonstrate that

an actor has actually assumed a duty above and beyond her general common-law

duty of care.[99]

  In general, a company's decision to set standards or policies in excess of that

required by the law does not give rise to a heightened duty of care under the Good

Samaritan rule.[100]  This holding stems from the principle that the law should not

penalize those "who strive for excellence" while simultaneously benefitting "those

who choose to set their own standard of care no higher" than is necessary to avoid

legal liability.[101]

---

[97]  *Hill v. Slippery Rock Univ.*, 2014 WL 11318258, at *7 (Pa. Com. Pl. Dec. 22, 2014) (quoting *Blewitt v. Man Rolan, Inc.*, 168 F. Supp. 2d 466, 469-70 (E.D. Pa. 2001)).

[98]  *Blewitt*, 162 F. Supp. 2d at 469-70 (citations omitted).

[99]  *Id.*

[100]  *E.g.*, *McCants v. Nat'l College Athletic Ass'n*, 201 F. Supp. 3d 732, 741-42 (M.D.N.C. 2016); *Mayall v. USA Water Polo, Inc.*, 174 F. Supp. 3d 1220, 1230 (C.D. Cal. 2016); *In re Welding Fume Prods. Liab. Litig.*, 526 F. Supp. 2d 775, 798-99 (N.D. Ohio 2007); *Ky. Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton, Inc.*, 24 F. Supp. 2d 755, 774 (W.D. Ky. 1998); *Texas v. Am. Tobacco Co.*, 14 F. Supp. 2d 956, 973 (E.D. Tex. 1997); *In re Tylenol (Acetaminophen) Mktg., Sales Prac. & Prods. Liab. Litig.*, 2016 WL 807377, at *8 n.22 (E.D. Pa. Mar. 2, 2016) ("[The defendant's internal policy] requires more of its employees than the legal standard of care (i.e., putting consumers, not shareholders, first).  Allowing the company to be judged on this standard could discourage companies from creating internal policies that go beyond what the law asks." (citations omitted)).

[101]  *Titchnell v. United States*, 681 F.2d 165, 173 (3d Cir. 1982) (explaining that a health care facility's failure to comply with its own internal guidelines does not necessarily give rise to a duty of care to follow these guidelines).

Martin relies heavily on *Hill v. Slippery Rock University* as an example of
where an organization's internal policies constituted an assumption of a legal duty
under the Good Samaritan rule.[102]   There, the National Collegiate Athletics
Association ("NCAA") had adopted a constitution providing that intercollegiate
athletics programs would be conducted to "protect and enhance the physical and
educational well-being of student-athletes."[103]   To this end, the NCAA had created
internal "safety recommendations" by which it "undertook to research and to then
impose certain medical condition testing and sports participation protocols upon its
member schools."[104]   Given that these recommended protocols were in fact
mandatory for member schools, *Hill* found that the NCAA's recommendations
gave rise to a legal duty.

Contrary to Martin's assertions, however, *Hill* is inapposite.   Unlike the
NCAA, which is an interscholastic sports organization overseeing programs on a
nationwide scale, Norfolk Southern is a railroad company.   It did not create a
constitution binding itself to certain persons, nor did it ever indicate that its internal
policies were specifically intended to benefit automobile drivers.   The facts of *Hill*
are thus distinguishable from those of this case.

Further, Norfolk Southern's policies are much more similar to "aspirational
statements" rather than legally binding proclamations.   Policy 400 explicitly

---

[102]   2014 WL 11318528 (Pa. Com. Pl. Dec. 22, 2014).
[103]   *Id.* at *7.
[104]   *Id.*

recognized that "state governments have the primary responsibility for highway

railroad crossing safety, including the location or closure of crossings and the

design and installation of crossing warning systems."[105]  And though Policies

400.1 and 400.2 established guidelines for the Commissions to conduct inspections

and make recommendations to various safety groups, such language cannot, by

itself, establish an assumption of a legal duty.  As a result, the Court finds

summary judgment on Martin's second claim appropriate; Defendants' motion on

this issue is granted.

### C.    Comparative Negligence

Finally, Defendants seek to dismiss both of Martin's claims on the basis that

Mr. Martin was more than fifty percent negligent as a matter of law.  Under

Pennsylvania's comparative-negligence statute, a plaintiff's recovery is barred

where her negligence was greater than the defendants'.[106]  "Comparative

negligence is ordinarily an issue for the jury."[107]  "This is not to say that a court

will never enter a nonsuit in a comparative negligence case."[108]  But "it is a rare

situation where it can be said that the plaintiff is more than 50% negligent as a

---

[105]  Doc. 113-5.

[106]  42 Pa. C.S.A. § 7102.

[107]  *Bouchard v. CSX Transp., Inc.*, 1996 Fed. Appx. 65, 70 (3d Cir. June 14, 2006) (citing *Gilbert v. Consol. Rail Corp.*, 623 A.2d 873, 876 (Pa. Commw. 1993)).

[108]  *Peair v. Home Ass'n of Enola Legion No. 751*, 430 A.2d 665, 669 (Pa. Super. 1981).

matter of law."[109]  To make such a finding, a court must find that "reasonable minds cannot legitimately differ" as to the plaintiff's negligence.[110]

Defendants claim that Martin's recovery is barred because Mr. Martin failed to comply with his common law and statutory duties to "stop, look, and listen" before entering a railroad crossing.  In support, Defendants cite the fact that Mr. Martin's vehicle did not stop in advance of the crossing as establishing that he failed to satisfy these duties.  Defendants further point to photographic evidence that they contend establishes that the train was plainly visible from Mr. Martin's vantage point.  The Court disagrees on both counts because reasonable minds may differ as to whether Mr. Martin failed to comply with either his common law or statutory duty to stop, look, and listen.

First, the Court finds that a genuine dispute of material fact exists as to whether Mr. Martin failed to comply with his common law duty to stop, look, and listen before entering the crossing.  "No principle is more firmly imbedded in the [common] law of Pennsylvania than that a traveler who is about to cross a railroad track must stop, look and listen.  This is an absolute and unbending rule of law."[111]

---

[109] *Gilbert v. Consolidated Rail Corp.*, 623 A.2d at 70 (*citing Peair*, 430 A.2d).

[110] *Gregorius v. Safeway Steel Scaffolds Co. of Pittsburgh*, 187 A.2d 646, 648 (Pa. 1963) (citations omitted) (discussing the standard for determining contributory negligence as a matter of law).

[111] *McGlinchey*, 356 F. Supp. at 1140 (internal quotation marks omitted) (quoting *Baltimore & O.R.R. v. Muldoon*, 102 F.2d 151 (3d Cir. 1939)); *see also Serfas v. Lehigh & N.E.R. Co.*, 113 A. 370, 371 (Pa. 1921) ("It is not a rule of evidence, but a rule of law, peremptory, absolute and unbending; and the jury can never be permitted to ignore it, to evade it, or to pare it away by distinctions and exceptions." (internal quotation marks omitted) (quoting *Aiken v. Penna R. Co.*, 18 A. 619, 620 (Pa. 1889))).

- 23 -

"As a matter of law, one who fails to perform this duty to himself is guilty of negligence."[112]

However, "[o]ne who fails to stop, look, and listen will not be precluded from recovering if his failure was not contributorily negligent."[113]  For example, a motorist is unable to hear or see an oncoming train may excused from his duty to stop, look, and listen prior to entering the crossing.[114]  As the Pennsylvania Supreme Court stated in *Johnson v. Pennsylvania Railroad Co.*, "[o]f what value is it to stop if stoppage does not allow the traveler to see the train, and of what value is it to listen, if the railroad fails to sound warning signals which perilous crossing demand?"[115]

Here, the Court cannot conclude as a matter of law that Mr. Martin's failure to stop, look, and listen did not result from his inability to adequately view the oncoming train.  Martin presents expert testimony stating that the sightlines at the Brick Church Road crossing were obstructed, and that, even he had stopped, Mr. Martin would not have been able to see the train as it approached.[116]  Such evidence is sufficient to establish a genuine issue of material fact as to the question

---

[112] *Evans v. Reading Co.*, 363 A.2d 1234, 1236 (Pa. Super. 1976) (citations omitted).
[113] *Id.*
[114] *Johnson*, 160 A.2d at 696 ("A railroad company that places a crossing at a point where it cannot be seen by the traveler until he is practically committed to passing over it, cannot use the stop, look and listen sign as a badge of immunity from liability for accidents occurring as the result of non-visibility.").
[115] *Id.*
[116] Doc. 111-4 at 4.

of whether Mr. Martin's failed to comply with his common-law duty to stop, look, and listen.

Second, the Court cannot determine as a matter of law that Mr. Martin failed to comply with his statutory duty to stop, look, and listen. Norfolk Southern argues that Mr. Martin's failure to stop constitutes negligence per se as a violation of Pennsylvania's stop, look, and listen statute. This statute requires all drivers to stop at least fifteen feet from the nearest rail when: (1) "[a] railroad train approaching within approximately 1,500 feet of the highway crossing emits a signal audible from that distance and the railroad train, by reason of its speed or nearness to the crossing, is a hazard"; or (2) "[a]n approaching railroad train is plainly visible and is in hazardous proximity to the crossing."[117]

Defendants contend that Mr. Martin's failure to stop is negligence per se because Martin does not contest that the train blew its horn or that the horn had been blown incorrectly. Further, Defendants argue that there is no evidence that the horn did not satisfy federal requirements, and that, in any event, any claims regarding the horn's "audibility" is preempted. Consequently, Defendants assert it appropriate to find Mr. Martin comparatively negligent as a matter of law.[118]

---

[117] 75 Pa. C.S.A. § 3341(a). This duty is also triggered where "[a] clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train," or where [a] crossing gate is lowered or a flagman gives or continues to give a signal of the approach of passage of a railroad train." *Id.*

[118] Defendants also claim that the train was "plainly visible" from at least fifteen feet away from the crossing. This contention fails for the same reasons discussed above—a genuine dispute of material fact exists as to whether the train was visible from this distance.

These arguments are unpersuasive.  Martin does not argue that the train failed to blow its horn, but she contests whether the horn was sufficiently audible to trigger Mr. Martin's statutory duty to stop.  In support, she cites an expert report finding that blowing a train's horn is an ineffective warning of the train's approach.[119]  This evidence is sufficient to create a genuine dispute of material fact regarding the horn's audibility.  The Court also finds Defendants' contentions regarding preemption inapposite; just because a *claim* regarding the sufficiency of a train's horn is preempted does not conclusive establish the horn's audibility as a *fact*.  Accordingly, whether the train's horn was audible is an issue properly submitted to the jury.

## V.      CONCLUSION

An appropriate Order follows.


BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[119]  Doc. 111-3 at 13.